ORIGINAL

RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JAN 1 3 2015

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

TWT

| | | |
|---|---|---|
| APRIL BAILEY, | § | |
| | § | |
| Plaintiff, | § | **CIVIL RIGHTS COMPLAINT** |
| | § | |
| vs. | § | CIVIL ACTION |
| | § | FILE NO.: |
| THE GEORGIA DEPARTMENT | § | **1:15-CV-0106** |
| OF LABOR, | § | |
| | § | **REQUEST FOR JURY TRIAL** |
| Defendant. | § | |

## PLAINTIFF'S TITLE 42 U.S.C. § 1981 COMPLAINT

COMES NOW the Plaintiff, APRIL BAILEY, *pro se*, (hereinafter "Plaintiff") and files this her, PLAINTIFF'S TITLE 42 U.S.C. § 1981 COMPLAINT, seeking to redress grievances brought pursuant to Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended. In support of her claims, Plaintiff respectfully shows the following:

## JURISDICTION

1.

This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 in that the subject matter arises under the laws of the

United States: Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended.

2.

This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1343 to recover damages and redress deprivation under the provisions of the statute.

## VENUE

3.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that each of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and the Georgia Department of Labor (hereinafter, "Defendant") may be found in this judicial district.

## PARTIES

4.

Plaintiff is a citizen of the United States and a resident of Georgia. At all relevant times, Plaintiff was employed as a Claims Examiner in the Central Examining Unit (hereinafter "CEU") with the Defendant.

5.

2

Defendant is a division of the United States government of the State of Georgia, charged with, <u>inter alia</u>, the processing of unemployment claims and the administration of State labor laws.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.

There are no administrative prerequisites to filing suit under Title 42 U.S.C. § 1981.

"Congress set up an elaborate administrative procedure, implemented through the EEOC, that is designed to assist in the investigation of claims of racial discrimination in the workplace and to work towards the resolution of these claims through conciliation, rather than litigation. See 42 U.S.C. § 2000e-5(b). Only after these procedures have been exhausted, and the plaintiff has obtained a 'right to sue' letter from the EEOC, may she bring a Title VII action in court. See 42 U.S.C. § 2000e-5(f)(1). Section 1981, by contrast, provides no administrative review or opportunity for conciliation." *Patterson v. McLean Credit Union, 4*91 U.S. 164 (1989)

## STATEMENT OF FACTS

7.

3

Plaintiff, an African-American female, began employment with the Defendant on or about February 1, 2010. Plaintiff held the position of Claims Examiner until her termination on or about January 18, 2011.

8.

During her tenure with Defendant, Plaintiff experienced a racially hostile work environment; failure to promote, disparate treatment from her Caucasian co-workers and her Caucasian supervisor, Lauri Allmaras (hereinafter "Allmaras"), with regard to job assignments, evaluations, compensation, and benefits; and retaliation.

9.

Plaintiff repeatedly requested to be transferred to another team, under the direction of a new supervisor, but Plaintiff was repeatedly denied.

10.

Consequently, in August 2010, Plaintiff filed a grievance against Allmaras and an internal investigation was launched. Plaintiff's grievance was based on harassment, retaliation, and intimidation for exercising her rights under the policies of the Georgia Department of Labor.

11.

4

Defendant subsequently retaliated against Plaintiff for filing the grievance against Allmaras by failing to transfer or promote her and subjected Plaintiff to harsher discipline than Plaintiff's Caucasian co-workers was subjected to.

12.

On January 18, 2011, with only two weeks remaining before Plaintiff would have become a permanent employee, entitled to full benefits from the Defendant, Plaintiff was issued a separation notice, which merely stated that the decision to terminate was in the Defendant's best interests.

## CAUSE OF ACTION

13.

Plaintiff alleges that her constitutional rights, privileges, and immunities have been violated and that the following facts form the basis for her allegations.

14.

"Like many other federal statutes, § 1981 does not contain a statute of limitations ... Congress enacted a catchall four-year statute of limitations for actions 'arising under an Act of Congress'... Section 1865 was enacted on December 1, 1990 ... The Supreme Court interpreted § 1865's 'arising under' requirement ... alleging hostile work environment, wrongful discharge, and refusal

to transfer under § 1981 …" *Johnson v. Lucent Techs., Inc.,* No. 09-55203, 2011 U.S. App. 9th Cir., (Aug. 4, 2011)

15.

"A civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658

16.

Plaintiff brings this suit against Defendant pursuant to Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended, for race discrimination (racially hostile work environment; failure to promote, disparate treatment from her Caucasian co-workers and her Caucasian supervisor, ("Allmaras"), with regard to job assignments, evaluations, compensation, and benefits), discriminatory termination, and retaliation. In support of her claims, Plaintiff respectfully shows the following.

## COUNT I – RACIALLY HOSTILE WORK ENVIRONMENT

17.

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the

6

security of persons and property as is enjoyed by white citizens..." 42 U.S.C. § 1981(a)

18.

"Individuals who exercise control over a Plaintiff's employment can be held liable under section 1981 ... Plaintiffs could proceed against individual defendants because there were triable issues of fact regarding whether they had exercised control in the employment decisions at issue, which would have rendered them essentially the same as the employer for purposes of the retaliatory conduct alleged." Wolf, Barry. *"Another Option For Retaliation Claims: U.S. Supreme Court Holds That 42 U.S.C. § 1981 Applies."* Plaintiff. July 2008. www.plaintiffmagazine.com 2 Jan. 2015

"The Civil Rights Act of 1991, enacted November 21, 1991, expanded § 1981 to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship'. § 1981(b). Given that the 1991 Act legislatively overruled Patterson (*supra*), ... It seems unreasonable to believe that in enacting the Civil Rights Act of 1991, Congress intended to make the scope of the new § 1981(b) narrower than that of the old § 1981 as it had been interpreted by this

7

Court and many other federal courts before Patterson ... *Foley v. University of Houston System*, 355 F.3d 333, 337-338 (5th Cir. 2003)

19.

Plaintiff's work schedule was 8:00am-4:30pm Monday through Friday. At the time, Claim Examiners were allowed to work until 6:00pm Monday-Friday.

20.

Between February 1, 2010 and February 5, 2010 Plaintiff completed new hire training with her Caucasian supervisor, Allmaras.

Between February 8, 2010 and February 12, 2010 Plaintiff was trained at an off-site Georgia Department of Labor Career Center.

Plaintiff returned to CEU to begin working on February 15, 2010.

21.

On or about February 25, 2010, after Plaintiff had clocked out and finished her shift at 4:30pm, Plaintiff remained in her work area to make copies of documents she needed in order to perform her job and to straighten her desk area. Ann Kaplan (Caucasian CEU Manager) (hereinafter "Kaplan") approached Plaintiff and asked her to leave. Kaplan told Plaintiff that Claim Examiners were only allowed to work until 6:00pm with the approval of their supervisors. Plaintiff explained that she did not know that this was not allowed and left the work area as

8

instructed. The next day, Allmaras, came over to Plaintiff's desk and stated that she heard there was an issue with Kaplan and said Claim Examiners were not allowed to be in the work area after their shift ended.

On or about April 6, 2010, a few minutes after Plaintiff clocked out at 4:30pm, Caucasian CEU supervisor Rosely Booker (hereinafter "Booker") came to Plaintiff's desk and asked her why was she still there. Plaintiff advised that she had clocked out and was filling out leave slips that needed to be submitted for the next day. Booker said okay and returned about 2 minutes later, tapped on Plaintiff's desk, and said "You need to leave right now". This happened at approximately 4:45pm. Plaintiff gathered her things and left as instructed.

On or about April 16, 2010 Kaplan called Plaintiff into a meeting with the Chief of CEU, Alexi Henry (hereinafter "Henry"). During the meeting Kaplan stated that Plaintiff had been told numerous times about staying in the work area late and that she was not following instructions. Plaintiff advised Henry of the above-noted occurrences and Henry said that he did not think completing leave slips was considered working. Henry said that employees were allowed a reasonable amount of time to leave the work area after the shift ended. Henry stated that 10 to 15 minutes was reasonable.

22.

On or about March 31, 2010, Allmaras, came over to Plaintiff's desk and verbally told her that because she was working independently and did not need much assistance she could work a "flex schedule". A flex schedule is where an employee can arrive to work between 7:00am and 9:00am and leave between 4:00pm and 5:30pm, so long as they work 8 hours from their arrival time and take a 30 minute break. Allmaras told Plaintiff that she could work a flex schedule effective the next day. The next day Plaintiff began working her flex schedule.

Plaintiff was not advised until April 30, 2010 that she could no longer work a flex schedule. Allmaras told Plaintiff that the reason Plaintiff could no longer work a flex schedule is because, per Henry, new employees could not work a flex schedule because they are not able to work compensatory time, and a new employee could only get compensatory time if they worked 17 claims a day. After Plaintiff was told this, her dates of attendance on April 20, 2010, April 23, 2010 and April 28, 2010 became an issue with Allmaras, although Allmaras advised Plaintiff that she could work a flex schedule. On April 20, 2010, April 23, 2010 and April 28, 2010 Plaintiff arrived to work after 8:00am because she had begun working a flex schedule.

On or about May 3, 2010 Allmaras advised Plaintiff that she was still on a working test (also known as probationary period) and her attendance was not

10

acceptable. Allmaras told Plaintiff to complete leave slips for April 20, 2010, April 23, 2010, and April 28, 2010. These dates should not have counted against Plaintiff since Allmaras said that Plaintiff could work a flex schedule and Plaintiff was not notified until April 30, 2010 that she could no longer work a flex schedule. Plaintiff complete the leave slips at Allmaras request.

23.

Plaintiff was issued a three page Memorandum of Concern and Expectations on July 26, 2010 by Allmaras. For state employees, a Memorandum of Concern and Expectations is a precursor to discharge.

Plaintiff responded to the Memorandum of Concern and Expectations on or about July 27, 2010 and submitted it to Human Resources (hereinafter "HR"), Michael L. Thurmond (at the time, Commissioner for the Georgia Department of Labor (hereinafter "Thurmond")), Brenda Brown (at the time, UI (Unemployment) Assistant Commissioner (hereinafter "Brown")), and Henry.

In Plaintiff's response she expressed her disagreements explained in the Memorandum of Concern and Expectations and advised Thurmond, Brown, and Henry that at hire, it was not explained to her that she would be on a work test for 1 year. It was not until Allmaras began to mention that Plaintiff was on a work test in her e-mails beginning May 3, 2010 that Plaintiff inquired with co-workers on

11

the meaning of the work test and how long it was. The only date Plaintiff was aware of at hire was her 6 month date on her PMF (Performance Management Form), which indicated a 6 month period ending on June 30, 2010. Allmaras' constant mention of Plaintiff's work test was threatening. Plaintiff requested that she be placed under a new supervisor for the remainder of her work test. To prevent any retaliation from her response to the Memorandum of Concern and to provide a fair opportunity to complete the work test, Plaintiff requested to be moved to CEU supervisor Gail Jones' (hereinafter "Jones" ) team immediately for the remainder of her work test, because in Allmaras' absence or unavailability, Plaintiff always sought guidance from Jones. Plaintiff's request to be moved was denied.

24.

Two days after Plaintiff sent her response to the Memorandum of Concern and Expectations to HR, Plaintiff was contacted by Operations Support Manager, Sharonda Ward-Sawyers (hereinafter "Sawyers"), who proposed a meeting to discuss her response to the Memorandum of Concern and Expectations. The meeting was schedule for August 11, 2010.

25.

12

August 6, 2010 Plaintiff had her first Benefit, Timeliness, Quality (hereinafter "BTQ") review for the months of April, May, and June of 2010. Plaintiff received copies of 5 out of 6 reviews for April and all of her May reviews, but did not receive copies of her June reviews. It was departmental policy that Plaintiff should receive a copy of all of her reviews. Allmaras withheld Plaintiff's BTQ review and Plaintiff was never made aware of her complete performance audit results for the months of April, May, and June. Allmaras never notified Plaintiff of any other BTQ review results.

26.

On August 11, 2010 Plaintiff met with Sawyers. Sawyers stated that: 1) a transfer to another supervisor or division was not warranted; 2) she recommended that any concerns Plaintiff had with her supervisor be addressed through the supervisory chain; 3) Plaintiff give her supervisor the opportunity to clear up any inconsistencies; 4) Plaintiff give her supervisor the opportunity to develop a better working relationship; 5) Plaintiff was encouraged to review job postings and apply for all positions that she believed she qualified for; and 6) the Memorandum of Concern and Expectations did not count against Plaintiff and would not be placed in Plaintiff's permanent file.

13

This was the second time Plaintiff requested to be moved from under Allmaras' and the request was denied. Sawyers advised Plaintiff that since she was not going to be transferred, she needed to find another job.

27.

At the time Plaintiff was employed with the Defendant, the rule was that Claim Examiners had to start their current day's schedule (also known as claims) by 10:00am. Plaintiff was never asked or required to advise Allmaras on what she was doing if she had not started her claims by 10:00am.

On or about August 13, 2010, Plaintiff had training with Allmaras.

On or about August 18, 2010, Plaintiff had BTQ training from 8:30am to 4:30pm.

On or about August 19, 2010, when Plaintiff arrived to work, she worked on her fact finding cards (used for unemployment hearings) because in BTQ training the day before, she learned some things that she needed to implement. She took the time to adjust her fact finding cards (which she had typed in Microsoft Word in February 2010 and had been using ever since) to the training she had received. She also reviewed training manuals to ensure she had the correct information to conduct her unemployment hearings. She did all this before 10:00am because she was only given 8 claims on her schedule that day and had only 11 pending claims

14

(pending claims are claims that have already been worked and only need follow-up attention). Prior to August 19, 2010, Allmaras never asked Plaintiff what she was doing prior to 10:00am.

At 10:02am on August 19, 2010, Plaintiff received an e-mail from Allmaras requesting that she come to her office. When she arrived, CEU Assistant Manager Oretha Williams (hereinafter "Williams") was present. Allmaras stated that she had a concern because no claims (pending or current) were started before 10:00am and wanted to know what Plaintiff was doing to justify the time lapse. Allmaras also stated that she brought in Williams to be her witness. Plaintiff advised Allmaras on what she was doing and Allmaras stated that Plaintiff needed to let her know when she was working on something other than claims. Plaintiff stated that 1) the work she was doing was work related, 2) Allmaras had never advised of this before, and 3) if there was a concern, instead of calling a meeting with a witness, who happens to be the department manager, Allmaras could have just asked what she was doing. Williams said that Allmaras and Plaintiff needed to communicate better and Plaintiff needed to tell Allmaras what she was doing and the meeting was over.

At 10:50am Plaintiff received an e-mail recap of the meeting where Williams and Henry where courtesy copied on the e-mail. Plaintiff responded to Allmaras' e-mail and recapped what she stated earlier. Plaintiff requested that in

her next meeting with Allmaras, to have a witness also, preferably Brown or Thurmond in the interest of justice, due process, and the administrative process. Plaintiff courtesy copied her response to Williams, Henry, and Brown. Immediately afterwards, Plaintiff e-mailed Brown with a third request for transfer; however Plaintiff never received a response from Brown regarding this request.

At approximately 2:45pm, Williams came over to Plaintiff's desk and advised that Henry was on the floor and he requested to have a meeting with her. Plaintiff quickly sent an e-mail to Brown asking if she was going to be present at the meeting. Brown never responded.

In Henry's meeting, he discussed the earlier meeting that day with Williams, Allmaras, and Plaintiff. Plaintiff explained 1) what was discussed in the BTQ training on August 18, 2010, 2) why she used the fact finding cards she typed in Microsoft Word, and 3) that she knew every question type is not to be used with every type of claim but the majority of the questions did apply. Also in the meeting Henry stated that 1) he felt Plaintiff had an attitude with him, 2) Plaintiff's request to have Brown or Thurmond as a witness could not be granted because they did not have the time, 3) Allmaras could have whomever she chose as a witness and it could be someone that he assigned or that worked under him, 4) that this was not a 4th Amendment issue, and 5) Plaintiff needed to "stop pushing back so much."

Plaintiff repeatedly advised Henry that she did not have an attitude with him, that she was not arguing with him, that she did not display unprofessional behavior, or argumentative behavior. Because Henry's witnesses (Williams and Allmaras) were his subordinates, their opinion on the matter was biased because he was their supervisor. Plaintiff was in the meeting by herself with 3 supervisors, this situation served as intimidation.

Plaintiff requested to have Brown or Thurmond as her witness because she was attempting to request a witness that was non-biased and a member of upper level management. Allowing Allmaras to have whomever she choose as a witness was discriminatory towards Plaintiff.

Henry was correct in that there was no 4th Amendment issue. However there was a 5th and 14th Amendment issue involving Equal Protection of Laws and Due Process of Laws. Defendant is a state agency and is therefore considered an arm or branch of the government. Under the 5th Amendment Plaintiff had a liberty right that had been infringed upon due to the harassment, retaliation, and intimidation she had received for exercising her rights under the Defendant's policies. Contrary to the 14th Amendment, Plaintiff was denied equal protection of the laws when Henry said that Allmaras could have whomever she chose as a witness and it could be someone that he assigned or that worked under him. Yet Plaintiff could not have

a person she desired as a witness. Plaintiff was not given the option to have a non-biased party present. This action on its face is discriminatory because discriminatory intent is present. This state action infringed upon a constitutionally protected right and constitutes a constitutional violation.

Plaintiff was not afforded any opportunity to obtain a witness prior to a meeting and Plaintiff had not been previously informed on what the meeting was to be about. This was a deprivation of a constitutionally protected right. The deprivation occurred when state action was taken without proper notice of the adverse action or a meaningful opportunity to be heard. In general, procedural due process requires the form of notice to be reasonably designed to ensure that persons will in fact be adequately notified of the proceedings and that there was some basic level of fair procedures and an unbiased decision maker. If Plaintiff failed to respond to a supervisor when they requested a meeting and they had a witness present, Plaintiff would have been accused of failing to comply with instructions from a supervisor or manager; insubordination. Once again, discriminatory intent is present.

28.

On the morning of August 20, 2010, Plaintiff received an e-mail from Henry stating that he had a concern with her "negativity and unprofessional demeanor."

18

Plaintiff again advised Henry repeatedly that she did not have an attitude with him and that she was not arguing with him, nor did she display unprofessional behavior or argumentative behavior. This situation served as intimidation and Henry's e-mail constituted intimidation and harassment.

29.

On or about August 23, 2010, Henry sent out a memorandum regarding staff reassignment because there were 2 new supervisors in CEU. However, Plaintiff was not moved. As of August 23, 2010, Plaintiff had requested three times to be moved from Allmaras' team but Plaintiff was not moved. Therefore, this action constituted retaliation.

30.

On or about August 26, 2010, while still employed with Defendant, Plaintiff filed a grievance against Allmaras. HR found the grounds of the grievance complaint to be valid and initiated an investigation against Allmaras, Henry, Brown, and Thurmond. Plaintiff's grievance was based on harassment, retaliation, and intimidation for exercising her rights under the policies of the Georgia Department of Labor.

To prevent any retaliation from the grievance process and to provide Plaintiff a fair opportunity to complete her work test, Plaintiff requested that she be

19

moved to Jones' team immediately. According the grievance policy, each Deputy Commissioner/Assistant Commissioner/Director shall serve as, or may select, an Agency Grievance Review Official that will be responsible for administering the grievance process for his/her division. Because Brown and Henry were involved in the grievance process, Plaintiff requested that they recuse themselves from the grievance process and that she receive written notification of their recusal. Plaintiff was never moved from Allmaras team during the grievance process and Plaintiff never received notification of Brown and Henry's recusal from the grievance process.

On or about October 13, 2010, (at the time) Assistant Commissioner to Thurmond, Andrea Harper (herein after "Harper"), sent Plaintiff a letter regarding the results of her grievance. The results stated: 1) Plaintiff's issues were unfounded; 2) Plaintiff exhibited a disregard for coaching and counseling; 3) attempts to provide additional training are viewed by Plaintiff as harassment, retaliation, and intimidation; 4) managements enforcement of applicable policy and procedures in the case were correct; 5) Plaintiff's request for a transfer to another supervisor or job within the department was denied; and 6) Brown requested to have a meeting with Plaintiff.

Plaintiff never received any kind of notification as to whether or not Brown and Henry recused themselves from the grievance process.

31.

A few days later Brown had a meeting with Henry, Allmaras, Sawyers, and Plaintiff to discuss the grievance. Brown stated that the grievance was over.

32.

On or about November 3, 2010 there was an incident involving Plaintiff and Mohammad Darvish (Caucasian male (hereinafter Darvish)), facilities manager. There was a meeting with Henry, Allmaras, Sawyers, and Plaintiff to discuss the issue on November 18, 2010. Henry asked Plaintiff to put her statement in writing. After the statement was provided nothing else was said to Plaintiff about this issue. Nothing else was done to resolve the issue. Plaintiff provided the below statement:

On November 3, 2010 Plaintiff was in the facilities office speaking with the front desk receptionist, advising them of the parking issue she was having that morning. While speaking with the receptionist, Darvish came out of his office. The receptionist said that I could speak with him regarding any concerns. Darvish then said that if I did not like the parking situation then I could find my own parking from that point forward. Darvish advised that upper level management told him that if anybody said that they had a problem with the parking situation they could

21

find their own parking and he could fix it so that Plaintiff could find her own parking. Plaintiff advised Darvish that she paid for parking and that it was not fair that she could not park her car. Darvish said that the Sheraton had many entrances and Plaintiff could have gone in the parking deck another way but Plaintiff explained that she did not know about the other entrances because the map she was provided only gives entry instructions for one entry way, and no one told her that she could enter the garage through the hotel entrance. Darvish then approached Plaintiff and said, "Like I told you, upper level management told me that if anybody doesn't like the parking situation they can find their own parking and since you have a problem with the parking I will let them know." Plaintiff told Darvish that there is always something wrong with the entrance she had been using. Darvish then grabbed Plaintiff's badge that was hanging around her neck and said, "What is your name? What is your name? Ok Ms. April Bailey. I'll fix this." And he walked out the door.

During this time another Caucasian male (name unknown) stepped in the room. The Caucasian male said that he always use the Sheraton Hotel's self-parking entrance and that was the best way to get in and if there was a problem there is always an attendant there.

22

The male Caucasian employee echoed Plaintiff's parking complaints yet Darvish responded hostilely toward Plaintiff and threatened that if Plaintiff did not like the parking situation, Darvish had been authorized by upper management to "fix it" so that Plaintiff would have to find her own parking. The male Caucasian employee, however, was not antagonized by Darvish in the way that Plaintiff was antagonized, and the male Caucasian employee was also given special instructions by Darvish to park at the Sheraton Hotel's self-parking entrance.

As a result of the conflict between Plaintiff and Darvish, Plaintiff was subsequently called to a meeting between Plaintiff, Henry, Allmaras, and Sawyers to discuss the issue. Plaintiff was also required to draft a written statement describing Plaintiff's version of what had occurred, and said statement was then placed in Plaintiff's permanent employment file.

The Caucasian male, however, was not called to a meeting to discuss his communications with Darvish, was not required to draft a written statement describing the event, and no such statement was required to be placed in his employment file.

33.

On January 18, 2011, at approximately 4:15pm, Henry met with Plaintiff. Present with Henry was Caucasian BPC Supervisor Sheila Jones (Benefit Payment

23

Control (hereinafter "S. Jones")). Plaintiff never worked with S. Jones. Henry handed Plaintiff her separation notice and stated that it was decided that "they" would no longer keep Plaintiff at the Georgia Department of Labor and asked Plaintiff to give him her ID badge and parking badge. Plaintiff's separation notice merely indicated that the decision to terminate was in the Defendant's best interests. Plaintiff asked Henry why she was terminated and he said, "At this time all I am going to say is that you did not meet the probationary period and you are being terminated." Plaintiff was not given a specific reason as to why she was being terminated.

Prior to termination, Plaintiff was not counseled, written up, suspended, placed on a performance plan, or even put on a progressive discipline plan. Plaintiff was not notified in any way that her work performance would cause her to lose her job. Plaintiff was discharged, at the recommendation of Allmaras, two weeks before her work test ended and she would have been considered a permanent employee of the Georgia Department of Labor, entitled to full benefits and increased compensation.

## COUNT II – FAILURE TO PROMOTE

34.

"...[A]n adverse employment action means an ultimate employment decision, such as hiring, granting leave, discharging, promoting, and compensating." *Foley v. University of Houston System*, 355 F.3d 333, 337-338 (5th Cir. 2003)

35.

As stated above, on August 11, 2010 Plaintiff met with Sawyers. Sawyers advised Plaintiff to review job postings and apply for all positions that Plaintiff felt qualified for, implying that Plaintiff would not be transferred from Allmaras' team and Plaintiff needed to find another job.

Thereafter, Plaintiff applied for numerous positions within the Department but was denied fair consideration.

36.

Plaintiff had overall qualifications, at least equal, to those of her Caucasian co-workers who had been promoted.

Plaintiff had earned a Bachelor's Degree and subsequently, both a Master's Degree and a Doctorate of Jurisprudence (hereinafter, "Juris Doctorate"). All of which were obtained prior to her employment start date with the Defendant.

37.

25

On or about October 2010, for example, Plaintiff made application for the position of Administrative Hearing Officer in the Appeals Division, which required candidates to possess a Juris Doctorate.

Defendant refused to consider Plaintiff for the Administrative Hearing Officer position and later awarded the position to a Caucasian applicant who did not possess a Juris Doctorate.

38.

On or about October 13, 2010, Harper sent Plaintiff a letter regarding the results of her grievance stating that Plaintiff's request for a transfer to another supervisor or job within the department was denied.

39.

Plaintiff engaged in conduct protected by Title 42 U.S.C. § 1981 when she filed her grievance. Plaintiff's non-promotion, after 1) being advised to apply for positions by the Defendant; 2) denied request for transfer from Allmaras' team; and 3) dismissed grievance, represented adverse employment actions. Defendant demonstrated continued hostility toward Plaintiff and attempted to undermine her employment status.

## COUNT III – DISPARATE TREATMENT

40.

"An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. *Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1247 (1994)

41.

"Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment ..." *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1014 (1980)

42.

"...[T]he plaintiff in a disparate treatment case must show the employer's intent to discriminate, but intent may be inferred from circumstantial evidence." *Domingo v. New England Fish Company*, 727 F.2d 1429, 1435 (9th Cir. 1984)

43.

During her tenure with Defendant, Plaintiff not only received inferior training but an inappropriate number of performance evaluations and resources as compared to her Caucasian peers.

44.

Plaintiff was subjected to disparate disciplinary treatment and inferior job training during her employment by Defendant.

45.

27

Plaintiff was disciplined more severely than her Caucasian co-workers in instances involving alleged violations of various company policies and procedures.

46.

For example, Allmaras required Plaintiff to work claims that she was not supposed to work, i.e. educational worker claims. Plaintiff once had a claim that she needed clarification on and she asked Williams about it. Williams asked Plaintiff why she was working that claim and if she had gotten her e-mail regarding educational workers. Plaintiff told her that the e-mail she received from Allmaras, said that examiners were to adjudicate all separation issues on educational worker claim. Williams stated that she advised all CEU supervisors that only those assigned to work educational worker claims, were to be doing educational worker claims, and Plaintiff was not assigned to work educational worker claims. All other examiners were not supposed to do education worker claims. Plaintiff advised that she did not get that message from Allmaras.

Allmaras refused to allow Plaintiff to end these claims on her work schedule so that the designated persons could work these claims. Allmaras intentionally had Plaintiff working on claims that she was not supposed to be working.

47.

28

One example of inferior job training occurred on April 16, 2011. While Plaintiff was meeting with Kaplan and Henry, Henry looked at Plaintiff's work scheduled and asked her questions about her claims. Plaintiff advised that what Henry was asking her about, she did not know how to do because she was not taught how to do those things (i.e., going back to the date of an old schedule, which is considered your pending claims list, and updating the notes on the old claim). Kaplan said that she did not realize Plaintiff did not know how to do what Henry was asking.

48.

On or about August 6, 2010, Plaintiff had her first BTQ review but only received copies of 5 out of 6 reviews for April and all of her May reviews. She never received a copy of her June reviews although it was departmental policy that she should receive a copy of all of her reviews. Allmaras withheld Plaintiff's performance evaluations and never notified Plaintiff of any other performance evaluations.

49.

During one of the Plaintiff's performance reviews, Plaintiff missed points for failing to correctly address severance payments. Prior to said review, Plaintiff

29

had not been properly trained as to how to address severance payments. Plaintiff's Caucasian co-workers were adequately trained in this area.

## COUNT V - RETALIATION

50.

"Because they arise under a post-December 1, 1990 Act of Congress, section 1981 retaliation claims are governed by the four-year statute of limitations under § 1658." *Johnson v. Lucent Techs., Inc.,* No. 09-55203, 2011 U.S. App. 9th Cir., (Aug. 4, 2011)

51.

"The Civil Rights Act of 1991 made retaliation claims once again possible … retaliation claims now 'arise under an Act of Congress' enacted after 1990, and the four-year statute of limitations in § 1685(a) applies." *Johnson v. Lucent Techs., Inc.,* No. 09-55203, 2011 U.S. App. 9th Cir., (Aug. 4, 2011)

52.

Defendant retaliated against Plaintiff for filing the grievance by failing to transfer or promote her and by subjecting Plaintiff to harsher discipline than Plaintiff's Caucasian co-workers.

53.

On or about August 23, 2010, Henry sent out a memorandum regarding staff reassignment. After Plaintiff's repeated request for transfer from Allmaras team, this would have been an opportune time to discretely move Plaintiff, but Plaintiff was not moved. Therefore, this action constituted retaliation.

54.

When Plaintiff responded to the Memorandum of Concern and Expectations, after repeated requests to be removed from Allmaras team, Sawyers told Plaintiff that a transfer to another supervisor or division was not warranted and that Plaintiff was encouraged to review job postings and apply for all positions that she believed she was qualified for. Sawyers implied to Plaintiff that since she was not going to be transferred, she needed to find another job. In retaliation to Plaintiff's response to the Memorandum of Concern and Expectations, Plaintiff's request for transfer was denied.

55.

When Plaintiff filed her grievance HR found the grounds of the grievance complaint to be valid and initiated an investigation. Plaintiff requested that she be moved from Allmaras team during the grievance process. Plaintiff was never moved from Allmaras team during the grievance process. Moreover, Plaintiff

31

never received notification of Brown and Henry's recusal from the grievance process.

Harper responded to Plaintiff's grievance by stating that Plaintiff's grievance was unfounded; Plaintiff exhibited a disregard for coaching and counseling; attempts to provide additional training are viewed by Plaintiff as harassment, retaliation, and intimidation; managements enforcement of applicable policy and procedures in the case were correct; Plaintiff's request for a transfer to another supervisor or job within the department was denied.

56.

Plaintiff requested to be transferred to another team but was repeatedly denied.

57.

Defendant created a hostile work environment for the Plaintiff.

58.

Plaintiff endured a hostile work environment during her employment, with Allmaras constantly providing Plaintiff with erroneous information such as, for example, Plaintiff could work a flex schedule, and causing Plaintiff to be penalized and/or reprimanded for following directions given by Allmaras.

59.

The retaliatory acts and hostile work environment created by the Defendant caused, and are causing, economic and emotional injury to Plaintiff and deprived Plaintiff of her rights under Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., and the Civil Rights Act of 1991 as amended.

## COUNT IV – DISCRIMINATORY TERMINATION

60.

"To amend the Civil Rights Act of 1964 to strengthen and improve Federal civil rights laws, to provide for damages in cases of intentional employment discrimination, to clarify provisions regarding disparate impact actions, and for other purposes." Civil Rights Act of 1991, An Act (Introduction)

61.

"…[A]n adverse employment action means an ultimate employment decision, such as hiring, granting leave, discharging, promoting, and compensating." *Foley v. University of Houston System*, 355 F.3d 333, 337-338 (5th Cir. 2003)

62.

"Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law … minimum procedural requirement are a

33

matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action ..." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)

"If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. 'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in public employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)

"An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case .... We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing

34

before he is deprived of any significant property interest'… This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment … Even decisions finding no constitutional violation in termination procedures have relied on the existence of some pretermination opportunity to respond. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)

"We have frequently recognized the severity of depriving a person of the means of livelihood … While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)

"…[S]ome opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Dismissals for cause will often involve factual disputes … Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect … the right to a hearing does not depend on a demonstration of certain success." *Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)*

35

"The governmental interest in immediate termination does not outweigh these interests ... affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)

"...[I]n the context of public employment ... the pretermination hearing ... should be an initial check against mistaken decisions - essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action ... The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985)

63.

As a result of Plaintiff taking steps to oppose Defendant's discriminatory practices toward her, Defendant unlawfully, knowingly and intentionally retaliated against Plaintiff by failing to transfer or promote her, issuing unwarranted discipline to her, and terminating her.

64.

On January 18, 2011, with only two weeks remaining before Plaintiff became a permanent employee entitled to full benefits from the Defendant, Plaintiff was issued a separation notice, at the recommendation of Allmaras, which merely stated that the decision to terminate was in the Defendant's best interests.

65.

Plaintiff asked Henry why she was being terminated. Plaintiff was not given a specific reason as to why she was being terminated.

Plaintiff was not given a pre-termination hearing, an opportunity to present rebuttal affidavits, or any opportunity to present a defense to prevent her termination.

66.

Prior to termination, Plaintiff was not counseled, written up, suspended, placed on a performance plan, or even put on a progressive discipline plan. Plaintiff was not notified that her work performance would cause her to lose her

37

job. Plaintiff was not notified that her job was in jeopardy. Plaintiff was discharged two weeks before her work test ended and she would have been considered a permanent employee of the Georgia Department of Labor.

67.

Unlike Plaintiff, Defendant's Caucasian employees were not disciplined for making such complaints as Plaintiff, and/or were given opportunities to address and resolve issues without termination.

Plaintiff was disciplined and later terminated without the same processes afforded the Caucasian employees.

68.

Reinstatement to employment with Defendant is not feasible under the circumstances.

69.

Since Plaintiff's discharge, she has continuously experienced ongoing harassment.

70.

Plaintiff has reapplied for her position on several occasions, as well as other positions for which she is qualified for, including upper level management positions. Plaintiff has continuously been denied re-employment with the

38

Department. Plaintiff has not been fairly considered for other positions of employment with the Georgia Department of Labor.

71.

Because Plaintiff was discharged from the Georgia Department of Labor, Plaintiff has an unlawful discharge on her employment record from the Defendant, who is state agency for the State of Georgia. Plaintiff is unable to secure employment with other state agencies for the State of Georgia.

## CONCLUSION

72.

At all pertinent times, Defendant was an employer subject to the provisions of Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended.

73.

At all pertinent times, Plaintiff was an employee entitled to protection under Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended.

74.

Defendant, through its agents, knowingly and intentionally engaged in unlawful discrimination based on Plaintiff's race, by subjecting Plaintiff to

disparate treatment as detailed above. Specifically, Defendant failed to promote Plaintiff, failed to adequately train the Plaintiff and issued Plaintiff unwarranted discipline not otherwise issued to similarly situated Caucasian employees and terminated Plaintiff's employment without affording her the same opportunities to which Caucasian employees have been given. Defendant also subjected Plaintiff to a racially hostile work environment and retaliated against Plaintiff

75.

The conduct of the Defendant, by and through its agents, deprived Plaintiff of her rights under Title 42 U.S.C. § 1981 et seq., Title 28 U. S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended.

76.

As a direct, natural, proximate and foreseeable result of the actions of Defendant, Plaintiff has suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

77.

Plaintiff brings the instant Complaint seeking an affirmative declaration that Defendant's practices toward Plaintiff violated her rights under Title 42 U.S.C. §

1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended.

78.

Further, and inasmuch as Defendant's actions were done with malice and/or reckless indifference to Plaintiff's federally protected rights, Plaintiff seeks damages, including punitive damages, in an amount commensurate with the gravity of the described violations, to the full extent of which is to be determined at trial.

79.

Inasmuch as Defendant's discriminatory conduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights, Plaintiff seeks damages, including punitive damages, in an amount commensurate with the gravity of the described violations, the full extent of which is to be determined at trial.

80.

Plaintiff reserves the right to bring additional causes of action against the Defendant and to move the Court to amend this Complaint as necessary.

81.

Plaintiff hereby re-alleges and incorporates by reference each and every allegation above, as if fully set forth verbatim herein.

82.

Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title 42 U.S.C. § 1981 et seq., Title 28 U.S. C. § 1658 et seq., the Civil Rights Act of 1964, and the Civil Rights Act of 1991 as amended.

## ATTORNEY'S FEES

83.

Plaintiff also seeks reasonable attorney's fees and costs under 42 U.S.C. § 1988.

84.

"…[A] significant factor in fee awards is the extent of success achieved in the litigation … representation by a public interest group should be compensated at the same rates charged by comparable private counsel … such cases were handled on a contingency basis, a factor which justifies a greater, not a lesser, award." *Domingo v. New England Fish Company*, 727 F.2d 1429, 1435 (9th Cir. 1984).

85.

Plaintiff reserves the right to seek and retain counsel.

## JURY DEMAND

42

86.

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby requests a jury trial on all claims and issues in this case, seeking both equitable and legal relief.

## **REMEDIES AND DAMAGES**

87.

"…[T]he filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a 1981 action … Congress did not expect that a 1981 court action usually would be resorted to only upon completion of Title VII procedures … Congress clearly has retained 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time-consuming procedures of Title VII. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454 (1975)

"…[T]he remedies available to the individual under Title VII are co-extensive with the individual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. 1981, and that the two procedures augment each other and are not mutually exclusive." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454 (1975)

88.

43

"…[I]t is well settled among the Federal Courts of Appeals … that affords a federal remedy against discrimination in private employment on the basis of race. An individual who establishes a cause of action under 1981 is entitled to both equitable and legal relief, including compensatory and … punitive damages … And a backpay award under 1981 is not restricted to the two years specified for backpay recovery under Title VII." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454 (1975)

89.

Under 42 U.S.C. § 1981, "…although the sum of compensatory and punitive damages is capped in absolute terms under Title VII, the proportion of punitive to compensatory damages is statutorily unconstrained. Thus in an individual case the ratio may be astronomical-in principle infinite..." *Kolstad v. American Dental Association, 119 S.Ct. 2118* (1999)

## **PRAYER FOR RELIEF**

90.

"In an action brought by a complaining party…against a respondent who engaged in unlawful intentional discrimination…the complaining party may recover compensatory and punitive damages …in addition to any relief authorized

44

by section 706(g) of the Civil Rights Act of 1964, from the respondent." *Civil Rights Act of 1991, Title I, SEC. 1977A (a) (1)*.

91.

WHEREFORE, Plaintiff demands judgment against Defendant, as prays as follows:

1. That Defendant is summoned to appear and answer, and that on final trial, judgment be granted against Defendant awarding damages to the Plaintiff, including compensatory and punitive damages, in an amount to be determined at trial;

2. Plaintiff further prays for pre-judgment and post-judgment interest, attorney's fees and costs of suit, including reasonable expert fees, as allowed by law;

3. Plaintiff further prays for injunctive relief; Plaintiff has an unlawful discharge on her record from the Defendant, Plaintiff prays that the termination is removed from the record so Plaintiff is able to secure other employment with the State of Georgia;

4. Plaintiff further prays for relief from the allegations of discrimination and retaliation as stated above, and that this Honorable Court grant the

45

money damages in an amount that is fair and equitable under the law, but not less than $300,000.00 (three hundred thousand dollars USD).

5. Plaintiff further prays any other and further relief that this Honorable Court considers just and proper.

Respectfully submitted,

Signed this __13ᵗʰ__ day of __January__ __2015__ .
         [day]         [month]         [year]

_____
Petitioner, *pro se*

Petitioner's Name (print or type): __April Bailey__
Petitioner's Address: __214 Kirkwood Road NE__
_____ Atlanta, GA 30317__
Petitioner's Telephone Number: __678-641-2318__

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| APRIL BAILEY, | § | |
| | § | |
| Plaintiff, | § | **CIVIL RIGHTS COMPLAINT** |
| | § | |
| vs. | § | CIVIL ACTION |
| | § | FILE NO.: _____ |
| THE GEORGIA DEPARTMENT | § | |
| OF LABOR, | § | |
| | § | **REQUEST FOR JURY TRIAL** |
| Defendant. | § | |

## **CERTIFICATION**

The undersigned hereby certifies that the within and foregoing

PLAINTIFF'S TITLE 42 U.S.C. § 1981 COMPLAINT was prepared in

accordance with LR 5.1(B).

Respectfully submitted,

Signed this __13th__ day of __January__ __2015__ .
       [day]        [month]        [year]

_____
Petitioner, *pro se*

Petitioner's Name (print or type): _April Bailey_____
Petitioner's Address: _214 Kirkwood Road NE_____
       _Atlanta, GA 30317_____
Petitioner's Telephone Number: _678-641-2318_____